Filed 8/27/14  In re Christopher V. CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re CHRISTOPHER V., A Person Coming Under the Juvenile Court Law. | B254496 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>BRENDA N.,<br><br>        Defendant and Appellant. | (Los Angeles County Super. Ct. No. CK86730) |

        APPEAL from an order of the Superior Court of Los Angeles County, Teresa Sullivan, Judge.  Affirmed.

        Grace Clark, under appointment by the Court of Appeal, for Defendant and Appellant.

        Office of the County Counsel, John F. Krattli, County Counsel, Dawyn R. Harrison, Assistant County Counsel, William D. Thetford, Principal Deputy County Counsel, for Plaintiff and Respondent.

Christopher V.'s mother Brenda N. (mother) appeals from the termination of her parental rights and argues that the juvenile court should have applied the "beneficial-relationship exception" to adoption. We disagree and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

1.    *2011*

In February 2011, police officers found four-year-old Christopher and mother at a motel. The officers observed mother smoking methamphetamine, and found marijuana and methamphetamines in the motel room within "easy access" of Christopher. The Department of Children and Family Services (Department) filed a petition alleging that mother's substance abuse placed Christopher at risk of harm. The juvenile court detained Christopher, and the Department placed him in foster care. The court ordered that mother have monitored three-hour visits with Christopher three times a week.

Christopher's father lived in Mexico and sought to have Christopher placed with his parents. He said that Christopher "was most of the time with my parents, because [mother] likes to go out and party." Paternal grandmother also sought to have Christopher placed with her and paternal grandfather, and said that mother had previously left Christopher with paternal grandparents for "months at a time" and that both mother and Christopher had lived with them for one year.

At the jurisdiction/disposition hearing on June 15, 2011, the court sustained the petition's allegations, removed Christopher from his parents' custody, and ordered the

2

Department to provide the parents with reunification services.[1]  Mother was ordered to attend a drug treatment program and parenting classes, and to participate in random drug testing and individual counseling.  With respect to visitation, the Department informed the court that mother was visiting with Christopher three times a week, and that Christopher's foster mother was monitoring the visits.  The court ordered that mother continue to have monitored visitation for a minimum of three hours per week.

In July 2011, Christopher said he enjoyed visiting with mother but that mother "spends a lot of the time on the phone" during visits.  He further said that he "would like to go home with [mother]" but also that he did not want to leave his foster mother because he "liked living with [her]."  Christopher's foster mother, who monitored visits between mother and Christopher, said that mother was generally "15 to 45 minutes late," was "not [] completely focused on [the] child," and "would sometimes be on the phone."

In September 2011, Christopher started having overnight weekend visits with his paternal grandparents.  The following month, Christopher said he liked spending time with his paternal grandparents and would prefer to live with them.  In December 2011, Christopher again said he liked having visits with his paternal grandparents and wanted to stay with them.  He also said he had "not really seen [mother] or spoken to her on the phone."

---

[1]  The record indicates that father did not participate in reunification services, and has not contested the termination of his parental rights with respect to Christopher.

The six-month review hearing was held on December 14, 2011. The Department reported that Christopher was displaying behavioral problems: he "scream[ed] and crie[d]" when asked to do his homework and engaged in "disruptive behavior in class." Paternal grandparents were now monitoring Christopher's visits with mother and reported that mother often cancelled visits at the "last minute" which upset Christopher. However, Christopher was generally "excited" to see mother when she did come, and he would tell her "about his day and [the] toys he had brought along."

The court found that mother was not in compliance with her case plan based on evidence that she had stopped attending a drug treatment program, had failed several drug tests, had not enrolled in individual counseling, had not completed parenting classes, and had not shown up to scheduled visits with her social worker. The court ordered the Department to provide mother with further reunification services.

2.    *2012*

In January 2012, Christopher was placed in the home of paternal grandparents. By June 2012, the paternal grandparents reported that Christopher had "adjusted well" to their home and now did his homework without tantrums. In addition, a child counselor who evaluated Christopher said that his behavior and anxiety had improved since being placed with paternal grandparents. With respect to visitation, paternal grandparents stated that mother continued to cancel visits at the last minute.

Christopher told the social worker that "he would cry and hide from mother," and that, on one occasion, he did not want to attend a birthday party with mother because her friends were " 'crazy.' " Christopher also said that he would "like to return home to

4

[] mother because she buys him toys," but that "if mother did not buy him toys anymore . . . he would want to continue residing with [paternal grandparents] because they are 'nice' to him." At the 12-month review hearing on June 13, 2012, the court found that mother was in partial compliance with her case plan and ordered the Department to continue to provide her with reunification services.

In August 2012, the Department reported that mother was consistently visiting Christopher. Christopher said he enjoyed spending time with mother and that he wanted to go home with her. However, the following month, paternal grandmother said that mother had cancelled visits with Christopher, and that Christopher cried and "bec[a]me[] upset" "[w]hen []mother d[id] not visit." Christopher said that "he wanted to return home with mother because he was excited mother was going to 'buy him a Wii and lead pencils,' " but when asked if he wanted to live with mother forever, said " 'sometimes, but [I] would also like to live with [paternal] grandparents.' " Christopher often did not want to talk to mother on the phone and, when asked why, said "I'm mad at her."

In October 2012, mother had scheduled a visit with Christopher, and Christopher cried because "he did not want to visit." Mother was then 30 minutes late to the visit which caused Christopher to become concerned she would not come. On November 6, 2012, the court found that mother had not complied with her case plan. The court terminated her reunification services and scheduled a Welfare and Institutions Code[2] section 366.26 hearing on the termination of parental rights. The prior visitation order

---

²       All other statutory references are to the Welfare & Institutions Code.

remained in effect. The following month, the paternal grandmother reported that mother had not been consistent with visits: visits sometimes did not take place because mother called the day of to schedule a visit, and mother was frequently late to visits.

3. *2013*

In April 2013, the paternal grandmother reported that, in the past month, mother had more consistently attended visits with Christopher, had arrived on time, and had "displayed good interaction" with him. As for Christopher, he had "good and bad days," and there was a recent incident when he did not want to go to a visit with mother. Paternal grandmother also reported that sometimes Christopher did not want to speak with mother on the phone, but that Christopher would engage in conversation with mother if mother promised to give him a present.

In May 2013, the social worker reported that mother's visitation had become inconsistent again. Christopher said he enjoyed having visits with mother but did not see her "much." He also said, " 'I don't want to go back with my mom because I remember a lot of things' " and that he did not want to be " 'around bad people.' " He told the social worker he was scared he might not be able to stay with paternal grandparents. Paternal grandparents said they wanted to adopt Christopher.

In June 2013, Christopher said that he enjoyed visits with mother, and also that " 'I think I want to go back with [mother] as long as I can see my grandparents.' " Paternal grandparents reported that mother's weekly visits had become more consistent again and that mother was now giving Christopher her full attention during visits.

In August 2013, Christopher told the social worker "[s]ometimes, I don't want to see her (mother) . . . . ' " After the social worker finished speaking to Christopher, mother called Christopher and he "hung up soon after." Mother called back and Christopher hung up on her again. Mother called a third time, and Christopher told paternal grandmother to tell mother that he was in the shower. Paternal grandmother said that mother had not visited Christopher for two weeks, and that Christopher did not want to see mother and cried when they took him to visits.

In September 2013, the Department reported that Christopher said he did not know whether he wanted to live with mother. When asked whether he would like unmonitored visits with mother, he said "yes, cuz sometimes she (mother) buys me stuff . . . . " When asked if he would like unmonitored visits if mother did not buy him anything, he said "I don't know."

In November 2013, the Department reported that mother had consistently attended weekly visits with Christopher and that Christopher no longer cried when he was dropped off at the visits. Christopher said he enjoyed the visits. Christopher had started participating in mental health services through the Wraparound program, and had shown improved behavior.

A section 366.26 hearing was held on December 3 and 9, 2013. Mother testified that she spoke with Christopher by phone every day, and that he called her "mom" or "mommy." She said she attended monitored visits with Christopher once or twice a week during which she played and read with him. Mother also said that although Christopher was bonded with his paternal grandparents, he is sad and wants to live with

her.  Upon cross-examination, mother acknowledged that she did not know the names of the school where Christopher attended kindergarten or his teacher there, and had never been to a parent-teacher conference.  Mother also said she knew Christopher was participating in therapy through the Wraparound program, but did not know what "issues" he was addressing in therapy.

Mother argued for the application of the beneficial-relationship exception to the termination of parental rights.  However, the court found that mother had not shown it would be detrimental to Christopher to terminate parental rights as he had lived with paternal grandparents for most of his life and they had parented him during that time.  In addition, the court stated that, "based on mother's testimony, she didn't know the school where [Christopher] had gone to kindergarten, didn't know his teacher, had just now understood some of the basic threshold levels of his daily life, [] had never been to a parent conference, had not participated in the Wrap[around] services that are sustaining this child's stability, and the report was that Christopher is conflicted and often doesn't want to see her at this time."  The court found that Christopher was adoptable and there was no legal exception to his adoption, and terminated parental rights.  Mother timely appealed.

### CONTENTIONS

Mother contends that her parental rights were improperly terminated because she established that Christopher would benefit from continuing his relationship with her under the beneficial-relationship exception.

8

## DISCUSSION

"At a permanency plan hearing, the court may order one of three alternatives: adoption, guardianship or long-term foster care. [Citation.] If the dependent child is adoptable, there is a strong preference for adoption over the alternative permanency plans." (*In re S.B.* (2008) 164 Cal.App.4th 289, 296-297.) "After . . . the court has found the child likely to be adopted, it is the parent's burden to show exceptional circumstances exist. [Citation.]" (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 574.) Section 366.26 provides an exception to the termination of parental rights when "[t]he court finds a compelling reason for determining that termination would be detrimental to the child due to . . . [¶] . . . [1] [the parent's having] maintained regular visitation and contact with the child and [2] the child would benefit from continuing the relationship." (Section 366.26, subd. (c)(1)(B)(i).)

Here, mother contends, and the Department does not dispute, that she maintained regular visitation and contact with Christopher. However, there were periods of time when mother failed to regularly visit Christopher: she cancelled visits or failed to contact his caregivers sufficiently in advance to schedule a visit. In addition, in order for the beneficial-relationship exception to apply, mother also had to show that she satisfied the second requirement of the exception: that Christopher would benefit from continuing the relationship.

The benefit prong of the exception requires that the parent prove that "the relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In

9

other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a *substantial, positive* emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated. [¶] Interaction between natural parent and child will always confer some incidental benefit to the child. The significant attachment from child to parent results from the adult's attention to the child's needs for physical care, nourishment, comfort, affection and stimulation. [Citation.] . . . [¶] The exception must be examined on a case-by-case basis, taking into account the many variables which affect a parent/child bond. [1] The age of the child, [2] the portion of the child's life spent in the parent's custody, [3] the 'positive' or 'negative' effect of interaction between parent and child, and [4] the child's particular needs are some of the variables which logically affect a parent/child bond." (*In re Autumn H., supra,* 27 Cal.App.4th at pp. 575-576 (italics added).) We review the trial court's ruling that the beneficial-relationship exception did not apply under the substantial evidence test. (*Id.* at pp. 576-577.)

Mother argues that, pursuant to the factors identified in *In re Autumn H.,* she showed that the continuation of her relationship with Christopher would be more beneficial to him than a permanent plan of adoption. Christopher was four years old when he was removed from mother, and seven years old at the time of the section 366.26 hearing. Although mother contends Christopher lived most of his life in

10

her custody, the record indicates that he spent at least an equal amount of time living with paternal grandparents. Paternal grandmother said that, prior to this case, both mother and Christopher had lived with paternal grandparents for a year, and also that mother had left Christopher with paternal grandparents for months at a time. At the start of this case, father also said that Christopher had lived "most of the time with my parents." In addition, Christopher lived with paternal grandparents for the two years leading up to the section 366.26 hearing.

Mother also argues that "[i]nteractions between Mother and Christopher were generally positive." However, as the juvenile court found, the record showed that Christopher had conflicted feelings about mother. Mother often called at the last minute to schedule a visit, arrived late for visits, and cancelled visits. This behavior upset Christopher, and, on multiple occasions, he cried when going to a visit with mother, indicated that he did not want to speak with mother or see her, and said that he preferred to live with paternal grandparents. Christopher also had bad memories from the time he was in mother's custody: he said that he was " 'around bad people' " when he lived with mother and, on one occasion, he became upset at the prospect of seeing mother's friends who he said were " 'crazy.' "

Mother also did not meet her burden of showing that she occupied a parental role in Christopher's life. She never progressed beyond monitored visits, was often inattentive to Christopher when she did visit him, was not knowledgeable about his schooling or his therapy, and did not provide for any of his physical needs other than occasionally providing food for him during visits. Paternal grandparents provided

11

Christopher with stability and, for much of his life, had taken care of his physical and emotional needs. The record showed that paternal grandparents had successfully helped Christopher improve his behavior and lessen his anxiety, and that Christopher primarily desired to live with them.

"[C]hildren are entitled to stability and permanence through adoption. 'Where a biological parent . . . is incapable of functioning in that role, the child should be given every opportunity to bond with an individual who will assume the role of a parent.' [Citation.]" (*In re C.F.* (2011) 193 Cal.App.4th 549, 557.) Here, mother failed to show that Christopher had "a substantial, positive emotional attachment" to her that promoted his well-being to such a degree as to outweigh the well-being he would gain in a stable home with paternal grandparents. (*In re Autumn H., supra,* 27 Cal.App.4th at p. 575.) Accordingly, there was substantial evidence to support the court's conclusion that no beneficial relationship existed between mother and Christopher such that termination of parental rights would be detrimental to him.

## *DISPOSITION**

The order is affirmed.


## *NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS*


                                                    KITCHING, Acting P. J.

I CONCUR:



ALDRICH, J.

---

**       Due to the unavailability of the third member of the panel which heard this matter, this opinion is being filed with the concurrence of the two remaining members of the panel.  (Cal. Const., art. VI, § 3 ["Concurrence of 2 judges present at the argument is necessary for a judgment"]; see, e.g., *People v. Castellano* (1978) 79 Cal.App.3d 844, 862.)